**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| SHEILAR SMITH, et al., On Behalf of Themselves and All Others Similarly Situated, and On Behalf of the OSF Plans | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 16-CV-467-SMY-RJD |
| vs. | ) ) | |
| OSF HEALTHCARE SYSTEM, et al., | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (Doc. 147). Plaintiffs filed a Response (Doc. 191) and Defendants filed a Reply (Doc. 194). For the following reasons, the motion will be **GRANTED.**

### <u>INTRODUCTION</u>

Defendant OSF Healthcare System ("OSF") is an Illinois 501(c)(3) non-profit corporation, founded by The Sisters of the Third Order of St. Francis ("St. Francis Order"). (Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment, Doc. 148 at 8-9. OSF operates eleven acute care hospitals, home health care services and other health care facilities in Illinois and Michigan. OSF has defined-benefits plans covering its own direct employees ("St. Francis Plan") and employees of the recently-acquired St. Anthony's Health Center ("St. Anthony's Plan").

Defendant Retirement Committee for the Retirement Plan for Employees of Saint Anthony's Health Center ("St. Anthony's Committee") is the administrator of the St. Anthony's

Plan. Defendant Sisters of the Third Order of St. Francis Employees Pension Plan Administrative Committee ("St. Francis Committee") is the administrator of the St. Francis Plan.

Plaintiffs Sheilar Smith and June Schwierjohn were employed at Saint Anthony's Health Center ("SAHC") until 2015 and 2016 respectively. Both are vested participants in the St. Anthony's Plan. Plaintiffs Kasandra Anton, Bonnie Bailey, and Peggy Wise were employed by OSF and are vested participants in the St. Francis Plan.

This case involves claims asserted under the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.L. 93–406, 88 Stat. 840 as amended. Specifically, Plaintiffs claim OSF and related entities have improperly treated the St. Anthony's Plan and St. Francis Plan (collectively, "the Plans") as "church plans" exempt from the requirements of ERISA. Plaintiffs allege that as a result, OSF has failed to fund the Plans' trust accounts to the levels required under ERISA to cover all accrued benefits, that the defendants failed to follow certain notice, disclosure and managerial requirements, and that the defendants have breached their fiduciary duties. (Fourth Amended Complaint, Doc. 138 at 41-56).[1] Plaintiffs also assert a claim for declaratory judgment, seeking a declaration that the church plan exemption as applied violates the Establishment Clause of the First Amendment, and is therefore unconstitutional. (Id. at 56-60).

## BACKGROUND

OSF is a nonprofit healthcare system. (Doc. 138, ¶¶ 17, 32). In 1880, the Sisters of the Third Order of St. Francis, an order of Franciscan sisters, incorporated as an Illinois nonprofit under the name "Sisters of the Third Order of St. Francis," with the stated objective of "conducting hospitals" (Doc. 150-1 at 1-6). The name of the corporation was changed to OSF

---

[1] Plaintiffs Fourth Amended Complaint added five "alternative" causes of action "for relief under State law if the Court determines that the OSF Plans are 'church plans' exempt from ERISA." (Docs. 120 and 138 at n. 4). These state law claims were subsequently dismissed. (Doc. 142).

Healthcare System in 1989, and the St. Francis Order formed a new Illinois nonprofit corporation named The Sisters of the Third Order of St. Francis ("STOSF") to "serve as an integral part of the Roman Church and to carry out its mission; [and] to carry on the corporal works of the mercy of the Roman Catholic Congregation of Sisters."  (Declaration of Sister Diane Marie McGrew, President of OSF, Doc. 150 at ¶¶11; Doc. 150-1 at 10-14; Doc. 150-4 at 2-6, 26).  The Sisters in the St. Francis Order are the only members of STOSF, which in turn is the sole member of OSF. (Doc. 150 at ¶ 9; Doc. 150-3 at 3).  STOSF's authority over OSF is governed by OSF's governing documents and the canonical and civil guidelines pertaining to Church properties. (Doc. 150-3 at 5).  In 2014, SAHC, a nonprofit Catholic hospital operated by The Sisters of St. Francis of the Martyr of St. George in Thuine ("St. George Order"), merged into OSF with the permission of the applicable Roman Catholic Church department and the endorsement of the Bishop of Springfield.  (Doc. 150 at ¶¶ 18-21; Doc. 150-6 at 11-14; Doc. 150-7).

OSF requires that its President and a majority of its Board of Directors be Sisters.  (Doc. 150-3 at 5, 11).  All directors (including lay members) are required to meet certain qualifications, including "Commitment to the Philosophy, Mission, Values and Vision of [STOSF,]" and "Commitment to uphold the Catholic Code of Ethics in all dealings and deliberations pertaining to the Board's responsibilities."  (Id. at 5-6).  Among the powers reserved to STOSF (as sole member of OSF) is the power to appoint, approve or remove OSF's chairperson, vice-chairperson, chief executive officer, president, chief medical officer/chief clinical officer, regional CEOs, and operating division presidents and CEOs.  (Id. at 3-4).  STOSF also has the power to "approve the introduction or termination of value sensitive ministries or services, and to eliminate services or activities which are in conflict with the philosophy and

purposes of the established ministry." (Id. at 5).  In the event OSF is dissolved, its assets revert to STOSF.  (Id. at 3).  OSF is recognized as a Catholic institution in the Official Catholic Directory.  (Doc. 149-7 at 6).  Its bylaws provide that any Medical Staff Bylaw or Rule is invalid if it conflicts with the Ethical and Religious Directives for Catholic Health Care Services ("ERDs") promulgated by the United States Conference of Catholic Bishops.  (Doc. 150-3 at 20-21).

Both Plans at issue in this case are sponsored by OSF.  (Docs. 138 and 140, ¶¶ 56-57, 72-74).  The St. Francis Plan has approximately 18,000 participants, and the St. Anthony's Plan has approximately 1,300 participants.  (Declaration of April M. Rowe, OSF Manager of Employee Benefits, Doc. 153 at ¶¶ 8, 9).  Sixty participants in the St. Francis Plan are employed by for-profit entities; none of the St. Anthony's Plan participants are employed by for-profit entities.  (Declaration of Amanda Lowry, Vice President Controller of OSF, Doc. 159 at ¶¶ 3, 5).

The St. Francis Plan is "administered and maintained" by the St. Francis Committee, whose members are appointed by the OSF Board of Directors (the majority of which is made up of St. Francis Order Sisters), and the majority of committee members must be Sisters.  (Doc. 153-1 at 63)  Currently, the Committee consists of seven voting members, four of whom are Sisters.  (Doc. 150 at ¶ 27).  The Committee is designated as the Plan Administrator and has "the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan."  (Doc. 153-1at 63-64).  The Committee's determinations are considered "conclusive and binding[.]"  (Id. at 64).  The Committee also holds "all powers necessary or appropriate to accomplish its duties under [the] Plan [and] [e]xcept as otherwise provided in [the] Plan, the Committee shall have full and complete authority, responsibility, and control in its sole and absolute discretion over the management, administration and operation of the Plan[.]"  (Id.).  Those powers include the determination of

eligibility to receive Plan benefits, computation and certification to OSF and the trustee of the amounts "necessary or desirable to be contributed to the Plan," and the administration of the Plan's claims procedures and claims review procedures.  (Id. at 64-65).  Under the St. Francis Plan, benefits "shall not be paid unless the [St. Francis Committee], in its discretion, determines that the Claimant is entitled to them."  (Id. at 65).  The Committee is separately empowered to "adopt such rules and decisions as it deems necessary or desirable."  (Id. at 65).  OSF has authority to amend the Plan, although any amendment that affects the rights, duties or responsibilities of the St. Francis Committee (other than its removal) must have the Committee's written consent.  (Id. at 70).

The St. Anthony's Committee is similarly charged with administering the St. Anthony's Plan, and "shall have all discretionary powers and authority necessary to carry out the provisions of the Plan."  (Doc. 153-2 at 50, 53).  Its members are the same as those of the St. Francis Committee – seven voting members, four of whom are St. Francis Order Sisters.  (Doc. 150 at ¶ 27).  "Any action or determination or decision whatsoever taken or made by the [St. Anthony's Committee] in good faith shall be final, binding and conclusive upon all persons concerned, including but not limited to the Employer, Employees and former Employees, Participants and former Participants and their spouses and Beneficiaries."  (Doc. 153-2 at 52).  The St. Anthony's Committee is responsible for Plan interpretation, benefit determinations, the claims process, and revision of the Plan to correct errors to effectuate the intent of the Plan.  (Id. at 50-53).  However, the St. Anthony's Committee cannot otherwise modify the Plan without the express consent of the employer's Board.  (Id. at 52).

## DISCUSSION

Defendants move for summary judgment on two bases: that the Plans properly qualify for the church plan exemption and are therefore not subject to the ERISA requirements which underpin the claims in Counts I-VIII; and that the church plan exemption is not unconstitutional as alleged in Count IX.   Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).  The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  When deciding a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

As an initial matter, Plaintiffs argue that Defendants' motion for summary judgment was filed prematurely.  *F.R.C.P.* 56(d) permits, but does not require, the Court to defer consideration of a summary judgment motion or to allow additional time for discovery, among other options. While there are numerous areas of inquiry that Plaintiffs state they would have explored prior to the filing of summary judgment motions, those pertinent to the instant motion have been at issue

from the outset of this case.  Although Defendants' filed for summary judgment well before the extended discovery deadline, Plaintiffs had ample time and opportunity to conduct discovery relevant to the issues raised in Defendants' motion.  As such, the Motion is not premature.

### Do the Plans Qualify for the ERISA Church Plan Exemption?

ERISA exempts "church plans" from its requirements.  29 U.S.C. § 1003(b)(2).  Originally, the statute defined a church plan as "a plan established and maintained ... for its employees ... by a church or by a convention or association of churches."  29 U.S.C. § 1002(33)(A).  In 1980, Congress passed the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), Pub. L. No. 96-364, § 407, 94 Stat. 1208 (1980), which amended the statute by expanding the scope of the church plan exemption.  Under the amended statute, "an 'employee of a church' includes an employee of a church-affiliated organization[.]"  *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1656, (2017) (citing 29 U.S.C. § 1002(33)(C)(ii)(II)).  The amendment also expanded the scope of the church plan exemption to include:

> A plan established and maintained for its employees ... by a church or by a convention or association of churches includes a plan maintained by an organization ... the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.  29 U.S.C. § 1002(33)(C)(i).

For purposes of defining church plans, "employees of a church" include "an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii)(II).  Thus, the term "employee of a church" includes employees of nonprofit organizations controlled by or associated with a church.

In its recent decision in *Advocate*, the Supreme Court concluded that the church plan exemption applies to certain Plans not established by a church.  Specifically, the Court found that "[u]nder the best reading of the statute, a plan maintained by a principal-purpose organization ... qualifies as a 'church plan,' regardless of who established it." *Advocate*, 137 S.Ct. at 1663.

Following *Advocate,* courts have engaged in a three-step inquiry in order to determine whether the church plan exemption applies to Plans maintained by principal-purpose organizations:

1. Is the entity whose employees the plan benefits a tax-exempt nonprofit organization associated with a church?

2. If so, is the entity's retirement plan maintained by a principal-purpose organization? That is, is the plan maintained by an organization whose principal purpose is administering or funding a retirement plan for entity employees?

3. If so, is that principal-purpose organization itself associated with a church?

*Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1222 (10th Cir. 2017).[2]  This Court will employ this approach.

### 1. Is OSF a Nonprofit Organization Associated With a Church?

 The entity whose plan is being maintained must be both a tax-exempt nonprofit and associated with a church, because "[t]he term employee of a church or a convention or association of churches includes [ ] an employee of an organization..., which is exempt from tax under [26 U.S.C. § 501] and which is controlled by or associated with a church or a convention or association of churches[.]"  29 U.S.C. § 1002(33)(C)(ii)(II).  Plaintiffs concede that OSF is a nonprofit organization, and that St. Anthony's Health Center was a nonprofit entity prior to its acquisition by OSF.  (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Doc.

---

[2] While not binding precedent, the Tenth Circuit's Opinion is well-reasoned and essentially "on all fours" with this case.  As such, the Court considers it very persuasive.

191 at 11).  What remains in dispute is whether OSF is "associated with" the church under the statute.

The term "associated with a church or convention or association of churches" refers to an organization that "shares common religious bonds and convictions with that church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(iv).  Here, the undisputed facts demonstrate that OSF "shares common religious bonds and convictions" with the Catholic Church.  As previously noted, STOSF (whose membership is limited to Sisters) is the sole member of OSF.  In addition to numerous references to Catholicism throughout its statements of values, OSF has incorporated Roman Catholic doctrine into its basic structure, including the qualification for directorship and the automatic invalidation of any medical bylaw or rule that conflicts with the ERDs formulated by the United States Conference of Catholic Bishops.  OSF is listed in the Official Catholic Directory, which "[c]ourts view…as a public declaration by the Roman Catholic Church that an organization is associated with the Church."  *Overall v. Ascension*, 23 F. Supp. 3d 816, 831 (E.D. Mich. 2014) (collecting cases).  OSF's "convictions" are evidenced by references to the doctrine, norms and dictates of the Roman Catholic Church, and the Catholic Church acknowledges OSF as an associated organization.  These facts reflect shared bonds and convictions and satisfy the statutory requirement that OSF be "associated with" a church or a convention or association of churches.  *See also Hall v. USAble Life*, 774 F. Supp. 2d 953, 960 (E.D. Ark. 2011).

The Court acknowledges Plaintiffs' urging for it to adopt the Fourth Circuit's "objective test" for determining whether an organization is "associated with a church or convention or association of churches."  In *Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 548 (4th Cir. 2001), the Fourth Circuit held that "[i]n deciding whether an organization shares such common bonds and

convictions with a church, three factors bear primary consideration: 1) whether the religious institution plays any official role in the governance of the organization; 2) whether the organization receives assistance from the religious institution; and 3) whether a denominational requirement exists for any employee or patient/customer of the organization." The Eighth Circuit subsequently found the test "useful." *Chronister v. Baptist Health*, 442 F.3d 648, 653 (8th Cir. 2006). This Court finds it less so. The existence of any of the three *Lown* considerations would certainly indicate institutional control. But "common bonds and convictions" entail something more. The Court agrees with the Tenth Circuit's assessment that the *Lown* factors "are much narrower than the broad language of the definition in § 1002(33)(C)(iv)" and therefore do not suffice as an exclusive test for association. *Medina*, 877 F.3d at 1224.

Plaintiffs also raise one of the affirmative exclusions from the definition of a church plan; disqualifying a plan "if less than substantially all of the individuals included in the plan" are employees of a church or are deemed employees of a church. 29 U.S.C. §1002(33)(B)(ii). Employees of a nonprofit organization controlled by or associated with a church are deemed employees of the church. Defendants assert (and Plaintiffs do not dispute) that all of the employees covered by the St. Anthony's Plan and all but 60 employees out of the approximately 18,000 covered by the St. Francis Plan are employees of OSF's nonprofit ventures. 99.6% certainly constitutes "substantially all." Therefore, the Plans are not excluded from the church plan definition on that basis.

### 2. Are the Plan Committees principal-purpose organizations?

A principal-purpose organization is one whose "principal purpose or function ... is the administration or funding of a plan or program for the provision of retirement benefits or welfare

benefits, or both, for the employees of a church." 29 U.S.C. § 1002(33)(C)(i).  "Organization" is not a defined term under the statute.  However, in defining "associated with," the statute provides that organizations may qualify "whether a civil law corporation or otherwise[.]"  29 U.S.C. § 1002(33)(C)(iv).  This suggests that principal purpose organizations need not be a separate, legally independent entity, and is consistent with the ordinary meaning of the term.

Black's Law Dictionary defines "organization" as "a body of persons (such as a union or corporation) formed for a common purpose."  Organization, *Black's Law Dictionary* (10th ed. 2014).  Similarly, the Oxford English Dictionary defines it as "[a]n organized body of people with a particular purpose, as a business, government department, charity, etc." Organization, *Oxford English Dictionary* (Third ed. 2004).  Neither of these definitions lead one to conclude that an organization must be legally separate from any other entity.  Several courts have interpreted the term in this manner and concluded that internal, non-independent subcommittees may qualify as "organizations" for purposes of the ERISA church plan exemption. *See Medina*, 877 F.3d at 1226; *Sanzone v. Health*, No. 4:16 CV 923 CDP, 2018 WL 4071897, at *7 (E.D. Mo. Aug. 27, 2018); and *Thorkelson v. Publ'g House of Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119, 1127 (D. Minn. 2011).  This Court joins them and finds that the Plan Committees are organizations for purposes of the Court's analysis.

Next, Plaintiffs challenge whether the Plan Committees actually "maintain" the Plans.  It is undisputed that the Plan Committees are the administrators of the Plans.  (Docs. 138 and 140 at ¶¶ 101-104, 106-108).  Nevertheless, Plaintiffs contend that OSF and SAHC (presumably before the acquisition) – not the Plan Committees – actually maintain the Plans.  More particularly, they argue that maintaining a Plan necessarily includes the power to modify or terminate it (powers that are at least partially reserved to OSF) as well as funding it.

These arguments were considered and rejected in *Medina*, 877 F.3d at 1224–25, and by District Judge Catherine Perry of the Eastern District of Missouri in *Sanzone,* 2018 WL 4071897, at *5. Both found that the "ordinary meaning" approach to interpreting the term "maintain" is appropriate, and found that the ordinary meaning did not require the power to modify or terminate the plan in order for an entity to be said to maintain it. "Maintain" has several definitions in Black's Law Dictionary, the most applicable one being "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." Maintain, *Black's Law Dictionary* (10th ed. 2014). Merriam-Webster's similarly defines "maintain" as "to keep in an existing state (as of repair, efficiency, or validity)"; "to continue or persevere in"; "sustain"; and "to support or provide for." Maintain, *Merriam-Webster's II Collegiate Dictionary* (10th ed. 2002). In holding that a subcommittee did "maintain" the Plan in question, the *Medina* court concluded, "when ERISA says that a church plan includes a plan 'maintained' by a principal-purpose organization, 29 U.S.C. § 1002(33)(C), it simply means the principal-purpose organization, as Black's says, 'cares for the plan for purposes of operational productivity.' And this is precisely the point of the Subcommittee." *Medina*, 877 F.3d at 1225. The Court agrees.[3]

The Plan Committees have authority over the Plans sufficient to meet the ordinary meaning of "maintaining" the Plans. The Committees are each given significant power and control over the interpretation of the Plans, the eligibility of claimants, entitlement to benefits, as

---

[3] Plaintiffs point to a recent ruling from the Northern District of California in *Rollins v. Dignity Health*, 2018 WL 4262334 (N.D. Cal. Sept. 6, 2018), disagreeing with *Medina* on the issue of whether "maintain" requires something more than its ordinary meaning. 2018 WL 4262334, at *6. The court there (and the Plaintiffs here) considered use of the ordinary meaning of "maintain" as synonymous with "administer" to render the term surplussage. Neither Plaintiffs nor the court in *Rollins*, however, discuss what the term "administer" means, rendering their discussion about whether "maintain" means something more than "administer" a sterile exercise.

well as rule-making authority.  This degree of authority is consistent with "caring for the Plans for purposes of operational productivity."

Plaintiffs also suggest that the Plan Committees do not have "primary ongoing responsibility (and potential liability) to plan participants [,]" and therefore they do not "maintain" the Plans.  (Doc. 191 at 18) (citing *Advocate*, 137 S. Ct. at 1661).  The record in this case, however, belies this suggestion.  Both Plans entrust decisions about participant claims, eligibility and benefits to their respective Plan Committee, including the eligibility of an employee, beneficiary or other person to receive Plan benefits, as well as the interpretation of Plan provisions and the administration of claims procedures.  The St. Francis Plan specifically states that "Benefits under the Plan shall not be paid unless the [St. Francis Committee], in its discretion, determines that the Claimant is entitled to them."  (Doc. 153-1 at 65).  These are central responsibilities that may give rise to claims for the wrongful denial of benefits.  The interpretation advocated by Plaintiffs, which necessitates the inclusion of plan funding and the power to modify or terminate the Plan, is simply too narrow.  One may be appointed caretaker to maintain a property without the authority to burn it to the ground, build an addition or sell it.[4]

### 3.   *Are the Plan Committees Associated with a Church?*

Whether the Plan Committees themselves are sufficiently associated with a church rests on ERISA's definition of the term "associated with"; "shar[ing] common religious bonds and convictions with that church or convention or association of churches."   29 U.S.C. § 1002(33)(C)(iv).   In that vein, the Plan Committees are tightly connected with the Roman Catholic Church.   They are both dominated by members of a recognized Roman Catholic

---

[4] Plaintiffs infer that the Plan Committees do not actually maintain the Plans, because the minutes appear to show that they meet infrequently and briefly.  But the question is not whether the Plan Committees are doing their jobs well or excessively delegating their authority, but rather whether the structure satisfies the requirements of the church plan definition.

religious order.  Moreover, to the extent the Plan Committees are internal organizations of OSF, they share OSF's Catholic affiliation.  See *Medina,* 877 F.3d at 1277.  See also *Advocate*, 137 S. Ct. 1659 ("[I]f A is exempt, and A includes C, then C is exempt.") (*quoting Overall*, 23 F.Supp.3d at 828).

Based on an examination of the record and the arguments of the parties in the context of the *Medina* factors, the Court is persuaded that the church plan exemption applies to the Plans at issue.

### Does the Church Plan Exemption Violate the Establishment Clause?

Alternatively, Plaintiffs argue that the application of the church plan exemption to the Plans at issue violates the Establishment Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. Amend. 1.  Challenges under the Establishment Clause are analyzed based on a three part test enunciated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Under the *Lemon* test, governmental action does not violate the Establishment Clause if (1) it has a secular purpose; (2) its principal or primary effect is one that neither advances nor inhibits religion; and (3) it does not foster an excessive government entanglement with religion. Conversely, governmental action violates of the Establishment Clause if it fails on any one of these three prongs.  *Books v. City of Elkhart, Indiana,* 235 F.3d 292, 301–02 (7th Cir. 2000) (citing *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987)).

The question relevant to the "purpose" prong is whether the challenged governmental conduct was done "for a religious purpose, or, put differently, whether its inclusion lacks a secular objective."  *Mayle v. United States*, 891 F.3d 680, 685–86 (7th Cir. 2018) (quotation and citation omitted).  "[H]aving just one secular purpose is sufficient to pass the *Lemon* test.  *Id.*,

citing *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 800 (7th Cir. 1999). The alleviation of significant governmental interference with the ability of religious organizations to define and carry out their religious missions constitutes a secular objective (See, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987), and has been found to apply to the ERISA church plan exemption. *Medina,* 877 F.3d at 1231 (detailing factors showing this 'secular purpose', including the legislative histories of both the original church plan exemption and the 1980 expansion of its scope).

The second question under the *Lemon* test is whether the church plan exemption's principal or primary effect is one that neither advances nor inhibits religion. Statutes that give special consideration to religious groups are not per se invalid. Rather, "[f]or a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the government itself has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337.

The church plan exemption is one of a number of statutes that relieve religious organizations from otherwise generally-applicable requirements, including the Internal Revenue Code, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii) (exempting "churches, their integrated auxiliaries, ... conventions or associations of churches," and "the exclusively religious activities of any religious order" from a tax-filing requirement) and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12113(d) (exempting religious organizations from anti-discrimination requirements), and 42 U.S.C. § 12187 (exempting religious organizations from public accommodation requirements). There is no principled distinction between these exemptions and the church plan exemption.

The final prong of the *Lemon* test involves an assessment of whether the government action fosters an excessive government entanglement with religion. The church exemption does

not.  Rather than entangling the government in the affairs of religious organizations, the church plan exemption avoids the entanglement.  In other words, by exempting eligible plans from ERISA requirements, religious organizations and their associated entities are relieved from government mandates about how they conduct their affairs, structure their finances and pursue their missions.  As such, the third prong of *Lemon* is satisfied, and application of the church plan exemption does not run afoul of the Establishment Clause.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (Doc. 147) is **GRANTED** and the case is **DISMISSED with prejudice**. All pending motions are **DENIED as MOOT**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiffs and to close the case

**IT IS SO ORDERED.**

**DATED:  September 28, 2018**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**